IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
July 22, 2003 Session

## STATE OF TENNESSEE v. FLOYD "BUTCH" WEBB

**Direct Appeal from the Circuit Court for Rhea County**
**No. 15551      J. Curtis Smith, Judge**

_____

**No. E2002-01989-CCA-R3-CD**
**February 3, 2004**
_____

The appellant, Floyd "Butch" Webb, was convicted by a Rhea County jury of one count of aggravated sexual battery, a Class B felony; two counts of sexual battery, Class E felonies; and four counts of child abuse, Class A misdemeanors.  Following a sentencing hearing, the trial court imposed a total effective sentence of twelve years to be served in the Tennessee Department of Correction.  On appeal, the appellant contends that (1) the trial court erred by admitting evidence of a fresh complaint by a child victim; (2) the trial court erred by allowing a witness to testify about medical records of which she was not the custodian; and (3) the sentence imposed by the trial court was excessive.  Upon review of the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which GARY R. WADE, P.J., joined. JOSEPH M. TIPTON, J., filed a separate concurring opinion.

B. Jeffery Harmon, Jasper, Tennessee, for the appellant, Floyd "Butch" Webb.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; J. Michael Taylor, District Attorney General; and Will Dunn, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

### I.  Factual Background

At trial, the fifteen-year-old victim testified that she was born on May 21, 1986.  On her eighth birthday, her mother married the appellant.  Initially, the victim "really liked" the appellant, but as time passed their relationship became "mixed up."  The victim related that before her ninth birthday, the appellant "started getting a little rough with [her]."

The victim testified that in June 1995, the family lived in a mobile home on Cottonport Road in Rhea County, Tennessee. The victim stated that one night,

> I was in bed asleep and [the appellant] came in my room, it was around 1:00 or 1:30 [a.m.], right after he got off work, and he came in and laid down on my bed and he started touching my breasts and my vagina. . . . I just laid there and acted like I was asleep, hoping he would just go away.

The victim stated that the appellant was in her room for approximately five to ten minutes. She did not understand what the appellant was doing to her, but it scared her. The victim related that the next morning, the appellant told her in a threatening manner not to tell her mother, "that it would just be between us." Because the victim believed that her mother loved the appellant and would be heartbroken if she knew the truth, and because the victim was afraid of the appellant, she did not tell her mother what had happened.

The victim testified that around July 4, 1995, when she was nine years old, the appellant again came into her room. According to the victim, when the appellant returned home from work around 1:30 a.m., he got into the victim's bed and began rubbing her breasts and vagina. The victim claimed that the appellant did this "[j]ust about every night through [the] whole month [of July]." Each night the appellant came into the victim's room, he stayed approximately five to ten minutes, and the next morning warned the victim not to tell anyone. The victim related that she once asked the appellant to stop, but the appellant became angry and gave the victim "a whipping."

The victim testified that one evening in November 1995, while the appellant's sister and brother-in-law were visiting from Alabama, the appellant came into the victim's bedroom wearing a Batman mask. The victim testified, "I just started screaming, and [the appellant's sister] . . . came in my room and tried to calm me down." After the appellant's sister and brother-in-law left and the victim's mother went to bed, the appellant returned to the victim's bedroom. The victim testified that "[h]e started petting me and telling me he was sorry for scaring me and then he started back in with the same stuff rubbing my breasts and my vagina." The victim resisted by pushing the appellant's hand away, but the appellant would not stop.

In December 1995, the victim's mother was homebound due to her pregnancy with the victim's sister and was required to stay in bed or on the couch. The victim claimed that while her mother was homebound, the appellant "would hold me down [o]n my bedroom floor. He would get me in a headlock. He would act like he was tickling me and then he would just start messing around and rubbing my breasts and vagina again." The victim testified that one day the appellant "put his fingers inside me."

The victim testified that one morning between January and May 1996, "I woke up . . . and there was blood all in my bed. . . . [My mother] thought I had started my period early . . . , [but the appellant] told her no, that I just had real bad bowel problems." According to the victim, the appellant had "penetrated [her] for the first time" the previous night and "[i]t really hurt." The victim testified that because there were many incidents, she was unable to recall the precise dates

that the appellant sexually abused her. The victim stated that she had her tenth birthday in May of 1996. At that time, the appellant was her stepfather and she called him "Daddy."

The victim testified that the family lived in the mobile home on Cottonport Road for approximately two years. Thereafter, the family moved to Mobile, Alabama. The victim related that while living in Alabama, the appellant decided that the victim should be homeschooled rather than attend public school. Her mother did not object. The victim testified that the family lived in Alabama from "July to Halloween, [1996]." The family then returned to Tennessee.

In May 1998, when the victim was twelve years old, the family lived in a townhouse in the Hidden Valley Apartments in Dayton, Tennessee. The victim's mother worked at the Bi-Lo Grocery Store, generally closing the store at night. The appellant was unemployed. The victim testified that one day "I was sitting [o]n the floor and [the appellant] told me to . . . get up on his bed and I did. . . . [H]e got on top of me and he started touching my vagina and he put his penis inside my vagina." The appellant pushed the victim's underwear and shorts to the side in order to penetrate her. The victim testified that she was scared and asked the appellant to stop, but he told her to "shut up." The appellant then began moving back and forth. This continued for approximately five minutes. When the appellant finished, he went into the bathroom and the victim went downstairs to "clean [herself] up." As she cleaned herself, the victim discovered a "[w]hite slimy clear liquid," but she did not know what it was. The victim testified that this was the first time the appellant had sexual intercourse with her. The victim maintained that because the appellant threatened to kill her, her mother, and himself, she did not tell her mother about these incidents.

The victim testified that the family subsequently moved into a house on Graham Street, where they lived from 1998 to 2000. The victim attempted to have friends over to visit, but the appellant would not allow it. The victim testified that her best friend, Amy Yearwood, lived across the street. However, she stated that visiting Amy was difficult. The victim explained that when she went to Amy's house, she was only allowed to go onto Amy's porch. She further explained that she was not allowed to be alone with Amy, and the appellant was always nearby.

The victim testified that in March 2000, her mother worked at the state health department. In order to save money, her mother ate lunch at home, generally around 1:00 p.m. One day at 11:00 a.m., the appellant told the victim to come into his bedroom. The victim related that the appellant then "started to have sex with me again," penetrating her with his fingers. Shortly thereafter, the victim's mother came home early for lunch and discovered the appellant on top of the victim. The victim related that her mother looked angry and confused. However, the appellant told the victim's mother that he was "just tickling" the victim. The victim got off the bed and went into the kitchen.

The victim testified that she was still afraid to tell her mother about the sexual abuse. The victim was concerned that her mother would not believe her. The victim testified that by March 2000, the appellant had adopted her. She related that she had been excited about the adoption, hoping it would change things.

The victim testified that she eventually confided to Amy Yearwood about "what [she was] going through," but told Amy not to tell anyone. Thereafter, Amy often came to the house uninvited to check on the victim. On one occasion, Amy came over when the victim was in the appellant's bed and the appellant was attempting to have sex with her. According to the victim, Amy began beating on the front door. Finally, the appellant told the victim, "just go answer it." The victim testified that she opened the front door wearing a bathrobe. However, because she was upset and afraid, she did not invite Amy to come inside the house.

The victim testified that on June 1, 2000, her mother finally learned of the abuse. According to the victim, that evening her mother and the appellant argued about the house. Thereafter, the victim's mother took the victim and her sister to their maternal grandparent's house. On the way to their grandparent's house, the victim's mother stopped at Bobby Riley's house because she was concerned about the appellant and wanted Riley, the appellant's friend, to check on him. While at Riley's house, Riley asked the victim if anything was happening between her and the appellant. The victim testified that she told him, "no," and went to play. After leaving Riley's house, the victim's mother again asked the victim if anything was happening between her and the appellant, and the victim told her about the abuse.

The victim testified that her mother was devastated and left the appellant. Approximately one week later, the victim's mother took the victim to talk with Dana Morgan of the Department of Children's Services (DCS) and with Investigator Chris Sneed. The victim was subsequently examined by Kathy Spada at the Children's Advocacy Center (CAC). At trial, the victim acknowledged that "something . . . happened to [her] when [she was] a small child before [the appellant] ever came into the family." However, she insisted that she did not remember the incident.

On cross-examination, the victim acknowledged that there were times she was "disappointed" in the appellant. However, she admitted that she had told others that she was happy about the adoption and that if her mother and the appellant ever "broke up," she wanted to live with the appellant. The victim acknowledged that prior to the adoption, she was required to talk with a psychologist and never mentioned any sexual abuse. The victim also conceded that the appellant was not present on the numerous occasions she told her mother that there was "nothing going on."

At trial, Pamela Webb, the victim's mother, testified that she married the appellant in May 1994 and the family moved into a mobile home on Cottonport Road near the home of the appellant's mother. Initially, Pamela worked the first shift at Robinson's Manufacturing and the appellant worked the second shift at Kayser-Roth.[1] Pamela testified that the first years of the marriage were "real good." However, as time passed, the relationship between the appellant and the victim did not appear to be normal. Pamela explained, "It's just like he would scare her and make her cry. I didn't know it at the time, I guess I know now, he was intimidating her."

---

[1] Because the appellant, the victim, and two witnesses share the last name "Webb," we have elected to utilize first names for the purpose of brevity. Additionally, we have elected to use the first names of the minor witnesses. We intend no disrespect to these individuals.

Pamela testified that in July 1995, the family moved to Alabama where they lived approximately six months. While in Alabama, the appellant was employed. Because the appellant did not approve of the schools in Alabama, he and Pamela decided to homeschool the victim who was in the third grade. Initially, Pamela taught the victim. However, at the end of October the family moved back to Tennessee, living in a townhouse at the Hidden Valley Apartments. Pamela related that she returned to work at the Bi-Lo Grocery Store, again working odd hours and often closing the store. The appellant, who was employed as a maintenance man at the apartments, began teaching the victim.

Pamela testified that while living in the townhouse, the victim had no visitors and the appellant did not allow the victim to go outside. Pamela acquiesced because the appellant was "the head of the household" and, thus, "made the rules." According to Pamela, the victim's attitude toward the appellant changed at this time. The victim began acting as though she were afraid of the appellant. Pamela testified that she asked the victim "if there was something she needed know," but the victim always answered, "No." Pamela stated that she had no reason to believe that the victim was not telling the truth.

A year later, the family moved into a house on Graham Street. Pamela testified that the appellant continued to homeschool the victim, while Pamela worked at various jobs. Pamela stated that the victim was homeschooled through the eighth grade. Although Pamela often asked the appellant to allow the victim to return to public school, the appellant "was adamant about home schooling [sic]" and became angry when she raised the issue. Pamela further testified that the appellant did not approve of the victim being taken to the doctor. She stated that if something happened to the victim, she was treated at home, "unless it was something that was really major that I had to take her to a doctor." Pamela testified that the appellant did not allow her or the victim to attend church. She explained, "It was easier to stay home than it was to come home and fuss and fight."

Pamela testified that when the victim went outside to play, either she or the appellant had to be outside with her. Moreover, the victim was only allowed to go outside for short periods of time and was confined to the yard. Pamela testified that the victim's friend, Amy Yearwood, lived across the street. The appellant did not allow the victim to go to Amy's house for any length of time or to spend the night with her. Additionally, the appellant did not allow the victim to have friends spend the night at their home. The appellant occasionally allowed the victim to play ball across the street with the neighborhood children, but either Pamela or the appellant had to watch the victim while she played.

Pamela testified that between January and May 1996, the victim "woke up one morning and she kept hollering for me to come in there and I come in there and there was blood and stuff on the sheets . . . ." Pamela believed that the victim had started her period. However, the appellant insisted that the victim was too young to have started her period and probably had an infection "in her bowels."

While the family lived in the house on Graham Street, Pamela began working at the state health department. Pamela testified that she worked from 8:00 a.m. to 4:30 p.m., taking her lunch break at 1:00 p.m. In order to save money, she ate lunch at home. On March 9, 2000, Pamela came home early for lunch. She testified,

> [W]hen I walked in the front door our small daughter, Elizabeth, was on the couch watching TV and I walked on through and start[ed] to turn to go into the bedroom and [the appellant] was over top of [the victim] and he kind of looked back at me and he started tickling her.

Although she felt odd, "[l]ike something wasn't right," she did not ask the victim about the incident.

During the last year of the marriage, the appellant's attitude and temperament changed. Pamela stated that the appellant was "hard" on the victim, claiming that the appellant said that "he had to keep his thumb on [the victim] so she wouldn't go bad." According to Pamela, the appellant "was in total control." During this time, Pamela asked the victim "if there was anything I needed to know," but the victim always told her, "No."

Prior to learning of the appellant's sexual abuse of the victim, Pamela and the appellant had an argument, although Pamela could not remember why they had argued. She stated that the appellant was angry and "he broke up a lot of things in the house and the kids were in the bedroom and they were scared . . . ." Pamela informed the appellant that she was taking their daughters to her father's house, and she and the girls left. On the way to her father's house, Pamela stopped at Bobby Riley's house because she wanted Riley to check on the appellant who had been very upset when she left. While at Riley's house, Riley spoke to the victim. Both Pamela and Riley asked the victim if there was anything she needed to tell them. Pamela testified that the victim "just dropped her head and said, 'No, I'm going to go play.'"

Pamela testified that when she and her daughters left Riley's house, she again questioned the victim. The victim replied, "I don't want to tell you." However, the victim finally told Pamela about the sexual abuse. Pamela testified, "I lost it, I broke down, I cried all the way to [my parents]." Pamela related that it took her approximately a week to regain her composure, stating, "I couldn't believe I give him my kid and he took advantage of her." On the same night that she learned of the sexual abuse, she called Riley and told him to tell the appellant that she knew about the abuse.

Pamela testified that she did not go to the police immediately because she "didn't know what to do." She finally called Dana Morgan at DCS after being told by her employer that if she did not report the crimes, she would be guilty of "upholding" the appellant. Pamela testified that she and the victim were subsequently interviewed by Investigator Sneed, who took items from her home for DNA testing. Thereafter, Pamela scheduled a physical examination of the victim. Pamela stated that as a result of the abuse, the victim had attempted to commit suicide several times and had been hospitalized at Valley Hospital. She stated that the victim also "scratche[d] herself to get the pain out."

On cross-examination, Pamela acknowledged that as part of the adoption process, the victim was required to speak with a psychologist. She conceded that the psychologist never notified her of any sexual abuse of the victim. Pamela denied telling Riley that she would not "press charges" if the appellant would give her the house, insisting that she only asked Riley to tell the appellant that she "wanted him out." She acknowledged that she was intimidated by the appellant, whom she claimed had become very controlling in the last four years of the marriage.

Investigator Chris Sneed, the chief investigator for the Dayton City Police Department, testified at trial that on June 13, 2000, he was notified by DCS of the possible sexual molestation of the victim. Investigator Sneed contacted the appellant in Alabama, and the appellant agreed to return to Tennessee for an interview. Investigator Sneed and Dana Morgan, a DCS case worker, were present at the interview on June 19, 2000. In their presence, the appellant signed a waiver and agreed to provide a statement. At trial, Investigator Sneed read into the record the appellant's statement, which had been compiled from the notes taken by Investigator Sneed and Morgan at the interview. Investigator Sneed testified that the statement as read adequately represented the statement given by the appellant.

Investigator Sneed testified that he also questioned the victim and her mother. He went to the family's house on Graham Street and retrieved a bedspread and sheets, a blanket, a bathrobe, and a sweatshirt to be sent to the Tennessee Bureau of Investigation Crime Laboratory for DNA testing. Investigator Sneed conceded that by the time he collected these items, several weeks had elapsed since the last alleged incident of sexual contact between the appellant and the victim. Moreover, Investigator Sneed was uncertain if the evidence had been washed prior to testing. In any event, the test results were negative "for anything that would have been evidence in this case."

Matt Presley and his sister, Amy Presley, testified at trial. Matt testified that in 2000, he lived with his parents on Graham Street, two houses down from the Webb family. He saw the Webb family only "when they would clean out the yard or something." He stated that in the neighborhood there were approximately six children who played together. Matt testified that "once in a blue moon," the victim would come play with them, but generally the appellant kept her inside the house. When the victim was allowed to play outside, it was for a short period of time and the door was kept open so that her parents "could keep an eye on her."

On cross-examination, Matt conceded that the appellant was not always at home and that at times the victim was home with her mother. He further acknowledged that he had never been inside the Webb home and knew nothing about the allegations made by the victim.

Amy Presley testified that she was raised by her grandmother, but often visited her parents and brother on Graham Street. Amy stated that when she visited her family, she rarely saw the victim. She related that when she did approach the victim, the appellant told the victim to come back into the house. Both Matt and Amy testified that on Memorial Day 1999, their parents had a cookout at their house. Matt, Amy, and Amy Yearwood walked to the victim's house to invite her to the party. Matt explained that "we knocked on the door and we didn't get a response, so we knocked

again. About 10 minutes later [the appellant] opened the door and we started to ask if [the victim] could come out, and rudely he said no and slammed the door."

At trial, Bobby Riley testified that he had known the appellant for twenty-five years and had often visited the Webb family on Graham Street. Riley stated that on Memorial Day 2000, Pamela, the victim, and Elizabeth came to his house in Mountain View. Pamela was visibly upset. Riley testified that he asked the victim "if anything had been going on between her and [the appellant]." Riley explained that as a result of that question, he went to the appellant's house. Later that evening, Pamela called Riley and asked him to talk to the appellant and tell him what had happened. Riley stated that Pamela also asked him to tell the appellant that "if [the appellant] would get out . . . she would leave it at that."

The next day, Riley went to see the appellant at the house on Graham Street. Riley told the appellant about the previous night and informed the appellant that the victim had told her mother about the abuse. Riley related that initially the appellant acted shocked, but soon the shock turned to anger. Riley testified that the appellant asked him what he should do and Riley told him, "If you're innocent, . . . [s]tay here and fight it till the end. . . . But if you have something to hide, Pam is giving you a chance to get out and I would get out." Shortly thereafter, the appellant went inside to pack.

Riley testified that after the family moved to Graham Street, he never saw the victim without the appellant being present. Riley found this to be unusual. He further testified that the police subsequently asked him to wear a wire to record a conversation with the appellant. Riley agreed; however, when Riley spoke with the appellant, the appellant said nothing incriminating.

Jamie Yearwood and her family lived on Graham Street across the street from the Webb family. At trial, Jamie Yearwood testified that the Webb family moved into the house on Graham Street in 1998. Her daughter, Amy, played with the victim, but the victim was only allowed to stay for short periods of time and was rarely allowed to go inside the Yearwoods' house. Once, the victim was allowed to spend an hour at Amy's birthday party. On another occasion, the victim was allowed to come into the house to see Amy's bedroom; however, the victim stayed only ten minutes, claiming that "she had to leave or [the appellant] would get mad." Yearwood estimated that Amy had been inside the victim's house approximately twenty times.

Yearwood testified that generally Amy and the victim would sit on the Yearwoods' front porch or the Webbs' front porch to visit. When the victim came to visit on the Yearwoods' front porch, the appellant was always nearby. Yearwood could not recall a time when the victim was allowed to visit without the appellant being somewhere he could "keep an eye on [her]." Yearwood testified that in June 1999, she had colon surgery and was confined to her house until September 1999. Yearwood stated, "I spent a lot of time on my front porch and I observed almost every day that when [the victim] was outside [the appellant] was outside and when [the appellant went] in [the victim went] in." Yearwood further testified that after catching the appellant staring at her through

the window in his computer room, she stopped mowing her lawn. She never became friends with the appellant or Pamela Webb, claiming that the appellant was a "secluded person."

Amy Yearwood testified at trial that her front porch was only thirty steps from the victim's front porch, and the two girls could converse easily from their porches. Amy related that she became friends with the victim approximately two months after the victim moved into the house across the street. After approximately five months, Amy began going to the victim's house, but the victim was rarely allowed to come to Amy's house. Amy further related that when she visited at the victim's house, "it was usually in the living room and [the victim's] mom and dad were in the room always." When Amy and the victim were allowed to go into the victim's bedroom, the door remained open in order for the victim's parents to hear their conversation.

Amy testified that the victim was allowed to visit on Amy's front porch, but generally had to return home within fifteen minutes. Moreover, the appellant was outside watching the victim while she was at Amy's house. Amy further testified that the victim was seldom allowed to play with the children in the neighborhood. When the victim was allowed to play, the appellant told her to come home after fifteen to twenty minutes. Amy testified that she occasionally saw the victim roller skating or riding her bicycle, but the victim was not allowed to go around the block.

Amy testified that in the summer of 2000, she went to the victim's house. Amy stated,

> I went to the door and I knocked and knocked and it was like 15
> minutes of standing there knocking and I wasn't leaving, because I
> knew she was there, and finally after about 15 minutes of knocking,
> [the victim] came to the door and she was very upset. She'd been
> crying.

Amy recalled that the victim was wearing a robe when she opened the door. Amy also recalled that one Memorial Day the Presleys had a barbeque at their house. Amy and the Presley children went to the victim's house to invite her to the barbeque. They "knocked and knocked" at the victim's door, but there was no answer. Eventually, the appellant opened the door. Amy asked if the victim could come to the Presley's barbeque, but the appellant said, "No," and shut the door in their faces. Amy related that the appellant acted a little nervous and hostile, "like ya'll leave me alone."

The final witness for the State was Kathy Spada, a pediatric nurse practitioner at T.C. Thompson Children's Hospital at Erlanger. Spada testified that she was also employed at CAC, where she treated children who have alleged sexual abuse. Spada explained her procedure for treating children brought to CAC. Initially, she interviews the child, because "[i]t kind of gives me an idea of what to look [for] on the medical exam." Next, Spada conducts a general physical examination, not emphasizing the "private area." Finally, Spada conducts a genital examination. Spada related that she had testified in more than seventy-five cases involving sexual abuse.

Spada testified that on July 3, 2000, the fourteen-year-old victim was brought to CAC by her mother, Pamela Webb. The victim gave a history of improper touching, sexual intercourse, and oral and anal penetration by her "stepfather." Spada testified that the victim was soft-spoken, pleasant,

and cooperative during the examination. Spada related that a genital examination revealed a "cleft" on the victim's hymen. Spada described the cleft as an irregularity that verified that "there had been some pressure there on her hymen." However, Spada conceded that she was unable to determine what had caused the pressure. Spada testified that her findings were consistent with the victim's allegations of sexual intercourse.

Over the defense counsel's objection, Spada was allowed to testify regarding her review of medical records which contained the results of an examination of the victim by another doctor when the victim was three years old. Spada testified that her review of the records revealed that at the time of the examination, "[t]here was some concern about sexually explicit talk at home and evidently the [m]om had taken the [victim] to be seen by this doctor." According to the records, the doctor had examined the three-year-old victim's genital area, finding the area to be "within normal limits." The doctor found no trauma or tears, but noted that the outside of the genital area was "a little red." Spada testified that based upon her review of the report, she agreed with the doctor's conclusion that there was no evidence of sexual abuse of the three-year-old victim. On cross-examination, Spada conceded that she was not a specialist in gynecology and that she had examined the victim on only one occasion.

Viva Lee Webb, the appellant's mother, testified on behalf of the appellant. Viva Lee testified that when her son and Pamela married, they moved into a mobile home on Viva Lee's property on Cottonport Road. She related that the victim came to her house "all the time." According to Viva Lee, she and the victim had a good relationship, and she treated the victim as if she were her granddaughter. She further testified that the victim often proclaimed that she loved the appellant and "he was her real dad now."

Viva Lee testified that the appellant and his family subsequently moved to Alabama, but returned to Tennessee in the fall of 1996. She stated that she visited the family at Hidden Valley Apartments, often coming over "unannounced." Viva Lee testified that she "never saw anything that bothered her." She related that the victim was generally doing her chores or studying. The victim acted normal around the appellant and never appeared to be avoiding him. According to Viva Lee, the victim tried to "hug on" the appellant, but the appellant was not an affectionate person.

Viva Lee testified that she also visited her son's family after they moved to Graham Street. She stated that when she visited, the victim was often outside playing or across the street at her friend Amy's house. Viva Lee maintained that when the victim was outside, "no one would be watching [her]." Moreover, when the appellant and his family lived in the mobile home on Cottonport Road, the appellant allowed the victim to attend church with Viva Lee. The victim never told Viva Lee about any sexual abuse.

Robert Wayne Reed, the appellant's brother-in-law, testified at trial that he was the pastor of a church in Alabama. He stated that he "really got to know" the appellant twenty-seven years earlier when he married the appellant's sister, Darlene. Reed related that he and Darlene attended the appellant's wedding and visited the family in Tennessee approximately twice a year.

Reed testified that he had been with the victim when the appellant was not present. He further related that he had observed the victim go outside and play without the appellant watching her. Reed stated that at Thanksgiving, the family gathered to eat dinner and play games. The victim "blended in," doing what everyone else was doing. Reed testified that he was a proponent of homeschooling. He testified that Pamela decided to homeschool the victim, but the appellant was opposed to the decision.

Reed testified that the victim never appeared to be avoiding the appellant. Moreover, the victim often told Reed and his wife that she loved the appellant and "always wanted to be with him." Reed testified that when the appellant decided to adopt the victim, the victim was excited about the adoption. According to Reed, the victim had a good relationship with the appellant and never told Reed or his wife about any sexual misconduct by the appellant. Reed stated that he never witnessed any suspicious behavior between the appellant and the victim.

At trial, the appellant testified that he met Pamela in 1994 or 1995 and they soon married. The appellant stated that he was aware of allegations that the victim had been molested when she was three years old. According to the appellant, the subject was often discussed in the presence of the victim, and the victim acted as though she remembered the abuse. "It's been drilled in her so much it's like she remembered it all."

The appellant testified that while he and his family lived in Alabama, his brother-in-law suggested homeschooling the victim. The appellant and Pamela discussed the subject and Pamela ultimately decided to homeschool the victim. Although the appellant was "skittish" about the schools in Alabama, he believed the victim should attend public school.

The appellant testified that initially Pamela taught the victim. However, after the family returned to Tennessee and Pamela returned to work at the Bi-Lo Grocery Store, the appellant assumed the responsibility of teaching the victim. The appellant stated that the victim was not a good student. In fact, because the victim had "slacked up," the appellant considered having the victim repeat a grade level. The appellant often restricted the victim's freedom in an effort to improve her schoolwork. According to the appellant, the victim had a bad temper and became "very angry and stand and claw her arms and bite them and stand and shake . . . if I really get on to her."

The appellant testified that the victim was allowed to go outside alone. The victim often played basketball with Matt Presley and went shopping with Pamela. The appellant further related that Pamela and her daughters went to Pamela's mother's house without him, occasionally staying overnight. One year he bought the victim a pair of roller skates for Christmas, and the victim skated at the apartments and "up and down" Graham Street. However, the appellant explained that when they first moved to the house on Graham Street, he and Pamela limited the area where the victim was allowed to play.

The appellant testified that occasionally the victim became angry with him, but generally "she . . . hung on to me like a leech. . . . She'd come through the house grabbing, hugging." The victim

also asked to go places with the appellant and became upset if he did not allow her to go. When the family lived on Graham Street, the victim's friends, including Amy Yearwood, came to visit. The victim also went to Amy's house. The appellant testified that although he and the victim were often outside at the same time, he was not "hang[ing] all over" the victim. The appellant explained that he often worked on the car or in the yard.

The appellant testified that the victim called him "Daddy" even before he and Pamela were married. Two to three years after they were married, the appellant began to consider adopting the victim. When he told the victim, she was very excited. The victim never told the appellant that she did not want to be adopted. The adoption became final in February 2000.

Regarding the incident when Pamela came home early for lunch, the appellant explained that the victim had prepared and eaten breakfast, then crawled into the appellant's bed. When he asked the victim what she was doing, the victim responded that she was sick. The appellant told the victim that she was not sick. He then rolled her over and told her to "get up." The appellant claimed that he tickled the victim around her collarbone and again told her to "get up." At that time, Pamela walked into the bedroom. The appellant testified that after the "tickling incident," Pamela never acted as though she did not want him around the victim or Elizabeth.

The appellant testified that shortly before the instant allegations, he and Pamela argued about refinancing the house and opening a checking account for Pamela. Following the argument, the appellant's friend, Bobby Riley, came to the house to deliver a message from Pamela. Riley informed the appellant of Pamela's accusations, telling the appellant that he could not win and "[i]f it was me I would get my stuff, get out, let her calm down and let it blow [over]." A few days later, the appellant went to Alabama to visit his sister. Investigator Sneed contacted the appellant in Alabama and asked him to return to Tennessee for an interview.

The appellant testified that the interview made him very uncomfortable. He further claimed that the statement read by Investigator Sneed was not verbatim. The appellant testified that he told Investigator Sneed and Dana Morgan that he did not commit the alleged acts against his daughter. He also agreed to DNA testing. The appellant stated that he was arrested two months later.

On cross-examination, the appellant denied "keeping [the victim] captive" or monitoring the victim's conversations. He further denied "beating" the victim. The appellant was unable to recall the alleged Memorial Day incident; however, he denied slamming the door on anyone. According to the appellant, when the victim was twelve and thirteen years old, she wanted to start dating and wearing makeup, but he would not allow it. The appellant acknowledged that he told Investigator Sneed that he did not believe the victim had engaged in sexual intercourse. The appellant testified that he believed the victim loved him and he did not understand why she made the allegations.

Based upon the foregoing testimony, the jury convicted the appellant of one count of aggravated sexual battery, two counts of sexual battery, and four counts of child abuse. Following the sentencing hearing, the trial court imposed an effective sentence of twelve years in the Tennessee

Department of Correction. On appeal, the appellant contends that (1) the trial court erred by admitting evidence of a fresh complaint by a child victim; (2) the trial court erred by allowing Kathy Spada to testify about medical records of which she was not the custodian; and (3) the sentence imposed by the trial court was excessive.

## II. Analysis

A. Fresh Complaint

On appeal, the appellant complains that the trial court erroneously admitted fresh complaint testimony by the victim. "[I]n cases where the victim is a child, neither the fact of the complaint nor the details of the complaint to a third party is admissible under the fresh-complaint doctrine." State v. Livingston, 907 S.W.2d 392, 395 (Tenn. 1995). However, evidence in the nature of fresh complaint may be admissible as substantive evidence if it satisfies a hearsay exception, or as corroborative evidence if it satisfies the prior consistent statement rule. Id. The appellant contends that neither of these exceptions was satisfied. The State asserts that the victim's testimony did not implicate the fresh-complaint doctrine, but instead was a legitimate part of her narrative.

At trial, the victim was allowed to testify over defense counsel's objection to the following:

State: Did Amy [Yearwood] know what you were going through?
Victim: Yes, sir.
State: Did you confide in her?
Victim: Yes, sir, I did.
State: Did you tell her not to tell?
Victim: Yes, sir.

We agree with the appellant that the testimony constituted fresh complaint by the child victim and was improperly admitted into evidence. See State v. William Terrell Hampton, No. E2000-00582-CCA-R3-CD, 2000 WL 1801859, at *4 (Knoxville, Dec. 8, 2000). However, the victim's statement was extremely brief and contained no details regarding the offenses. Moreover, Amy Yearwood did not testify to what the victim allegedly told her, nor did she testify that she was aware that the victim was being sexually abused. Under these circumstances, we are unable to conclude that the admission of the fresh complaint more probably than not affected the outcome of the trial; thus, the error was harmless. Tenn. R. App. P. 36(b); see also Hampton, 2000 WL 1801859, at *4.

B. Medical Records

The State anticipated that the defense would attempt to demonstrate the victim's knowledge of sexual matters by introducing evidence that the victim was sexually abused by someone other than the appellant when she was three years old. Accordingly, the State asked nurse practitioner Kathy Spada to review the medical records from an examination of the victim when she was three years old. Spada was then asked to testify regarding her opinion of the results of the examination. Defense counsel objected, asserting that Spada was not affiliated with the hospital or the doctor who

-13-

conducted the examination and, therefore, could not lay the proper foundation for the introduction of the records into evidence. However, the State maintained that it was not seeking to introduce the medical records, but was only asking that Spada be allowed to "express an opinion based upon what she . . . read in the report." The trial court allowed the testimony.

On appeal, the appellant contends that the trial court violated the hearsay rule "by allowing testimony regarding medical records by someone who was not the custodian or other qualified witness." However, our review of the record reveals that the trial court did not admit the testimony under the business record exception to the hearsay rule. Instead, the trial court allowed Spada to testify as an expert witness to her opinion, which opinion she based upon information contained in the medical records. The medical records were not admitted into evidence.

"If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. An expert may base her opinion upon facts or data imparted to or perceived by the expert prior to or at a hearing, and the facts or data need not be admissible if they are the type of facts or data reasonably relied upon by experts in the particular field. Tenn. R. Evid. 703. The trial court shall disallow testimony in the form of an opinion if the underlying facts or data indicate a lack of trustworthiness. Id. "Questions regarding the qualifications, admissibility, relevancy, and competency of expert testimony are matters left within the broad discretion of the trial court." State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002). This court will not overturn the trial court's ruling regarding the admissibility of expert testimony absent an abuse of discretion. Id.

Spada testified that the report revealed that at the time of the examination, "[t]here was some concern about sexually explicit talk at home and evidently the [m]om had taken the [victim] to be seen by this doctor." The report further revealed that the treating physician found the three-year-old victim's genital area to be "within normal limits," noting no trauma or tears. Spada testified that based upon the information contained in the report, she agreed with the treating physician's assessment that there was no sign that the three-year-old-victim had been sexually abused.

The trial court erred by allowing Spada to testify to the contents of the twelve-year-old report. However, under Rule 703, Spada was allowed to testify based upon her own experience, her examination of the victim, and her review of the information contained in the report, that she opined that the victim had sustained her injuries since the examination at age three. Tenn. R. Evid. 703. Regardless, an error will not be grounds for reversal unless it affirmatively appears to have affected the result of the trial on the merits. Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b). In light of the overwhelming evidence against the appellant, we are unable to conclude that Spada's improper testimony affected the outcome of the trial. Accordingly, the error was harmless.

We note that during Spada's testimony, the trial court failed to designate Spada as an expert witness. However, the trial court subsequently instructed the jury regarding expert testimony, stating, "I believe Mrs. Spada was the only witness that appeared [at] trial that comes under that

-14-

category."[2]  Moreover, Spada testified at trial that she had been employed as a pediatric nurse practitioner at T.C. Thompson Children's Hospital for seven years and that she also worked at CAC, examining children who had allegedly been sexually abused.  Spada further related that she "work[ed] at the sexual assault center and assess[ed] adults as well."  Spada testified that she had a master's degree in nursing, was a member of the International Forensic Nurse's Association, and had taken multiple courses on forensic examination.  Based upon this evidence, we conclude that Spada was qualified to testify as an expert.

C.  Sentence

Finally, the appellant contends that the sentence imposed by the trial court was excessive. When an appellant challenges the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by the trial court are correct.  Tenn. Code Ann. § 40-35-401(d) (1997).  However, this presumption of correctness is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances."  State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).  If the record demonstrates that the trial court failed to consider the sentencing principles and the relevant facts and circumstances, review of the sentence will be purely de novo. Id.

In conducting our review, this court must consider (1) the evidence, if any, received at trial and at the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to the sentencing alternatives; (4) the nature and characteristics of the offenses; (5) any mitigating or enhancement factors; (6) any statements made by the appellant on his own behalf; and (7) the appellant's potential for rehabilitation or treatment.  Tenn. Code Ann. § 40-35-102 and -103 (1997), -210 (Supp. 2002); see also Ashby, 823 S.W.2d at 168.  The burden is on the appellant to show that the sentence is improper.  Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments.

The appellant was sentenced as a Range I standard offender, for which the applicable range is eight to twelve years for Class B felonies and one to two years for Class E felonies.  Tenn. Code Ann. § 40-35-112(a) (1997).  The presumptive sentence for Class B and E felonies is the minimum within the applicable range if there are no enhancement or mitigating factors.  Tenn. Code Ann. § 40-35-210(c).  If the trial court finds that such factors do exist, the court must start at the presumptive sentence, enhance the sentence within the range as appropriate for the enhancement factors, and then reduce the sentence within the range as appropriate for the mitigating factors.  Tenn. Code Ann. § 40-35-210(e).  There is no mathematical formula for valuating factors to calculate the appropriate sentence.  State v. Boggs, 932 S.W.2d 467, 475 (Tenn. Crim. App. 1996).  "Rather, the weight to be afforded an existing factor is left to the trial court's discretion so long as the trial court

---

[2] The appellant did not object to the trial court's instruction regarding expert testimony or to the trial court's assertion that Spada had testified as an expert witness.

complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record." Id. at 475-76.

At the sentencing hearing, the State presented no testimony, relying solely upon the presentence report. Viva Lee Webb, the appellant's mother, and Robert Reed, the appellant's brother-in-law, testified on behalf of the appellant. The appellant's mother testified that she had never had any problems with the appellant. She further related that because she was disabled, she depended on the appellant to take her to doctor's appointments and maintain her yard, house, and vehicle. Reed testified that he had never known the appellant to be in any trouble. Both Reed and the appellant's mother testified that the appellant would not be a threat to society upon release.

Based upon the foregoing testimony, the presentence report, and the arguments of counsel, the trial court applied enhancement factor (15), i.e., the appellant abused a position of public or private trust. Tenn. Code Ann. § 40-35-114(15) (1997).[3] The trial court afforded the factor great weight, increasing the appellant's sentence for aggravated sexual battery, a Class B felony, to eleven years and the sentences for sexual battery, Class E felonies, to two years. The trial court applied mitigating factors (1), i.e., the appellant's conduct neither caused nor threatened serious bodily injury, and (13), i.e., any other factor consistent with the purposes of this chapter. Tenn. Code Ann. § 40-35-113(1) and (13) (1997). In applying mitigating factor (13), the trial court found that the appellant had no criminal history and, except for the instant offenses, had been "a good citizen and a good son." Based upon the application of these mitigating factors, the trial court reduced the appellant's sentence for aggravated sexual battery to ten years, but did not reduce the appellant's sentences for sexual battery. For the child abuse convictions, Class A misdemeanors, the trial court sentenced the appellant to eleven months and twenty-nine days of confinement. The trial court ordered the Class E felonies and the Class A misdemeanors to be served concurrently to each other, but consecutively to the Class B felony, for a total effective sentence of twelve years incarceration.

1. Enhancement Factor (15)

The appellant contends that the trial court afforded "improper weight to the sole enhancing factor." However, as previously noted, the weight to be afforded an enhancement factor is left to the trial court's discretion so long as the court complies with the purposes and principles of sentencing and its findings are adequately supported by the record. Boggs, 932 S.W.2d at 475-76. Enhancement factor (15) provides for the enhancement of a sentence when the defendant abuses a position of public or private trust in committing the offense. Tenn. Code Ann. § 40-35-114(15) (1997). Our supreme court has observed that, when an adult perpetrator and a minor victim are members of the same household, "the adult occupies a position of 'presumptive private trust' with respect to the minor." State v. Gutierrez, 5 S.W.3d 641, 645 (Tenn. 1999). In the instant case, the

---

[3] We note that, beginning July 4, 2002, "the 2002 amendment [to Tennessee Code Annotated section 40-35-114] added present [enhancement factor] (1) and redesignated former (1) through (22) as present (2) through (23), respectively." Tenn. Code Ann. § 40-35-114, Amendments (Supp. 2002). However, for the purposes of this opinion, we will use the former designations applicable at the time of the appellant's sentencing.

appellant and the victim were members of the same household. The appellant was the victim's stepfather and subsequently adopted the victim. Additionally, for the majority of his marriage to the victim's mother, the appellant cared for and homeschooled the victim while her mother worked. Accordingly, we conclude that the appellant occupied a position of private trust with respect to the victim. Thus, the trial court committed no error in applying enhancement factor (15) and affording the factor great weight.

## 2. Consecutive Sentencing

Finally, the appellant asserts that the trial court erred by ordering the appellant to serve his sentence for aggravated sexual battery consecutively to his other sentences. In imposing consecutive sentences, the trial court found,

> [A] number of [these] offenses [were] of a sexual nature, a stepdaughter situation. . . . I find that there was particularly great injury, psychological and emotional damage without a doubt.
>
> These offenses occurred over a long period of time. . . . A significant span of time. The jury found [the appellant] guilty of offenses that spanned a number of years.
>
> Given the nature of these offenses and the length of time involved, this [c]ourt finds that it is necessary to protect the public and the victim from future criminal conduct of [the appellant]. Certainly some consecutive sentencing is warranted here because it's reasonably related to the severity of the crime.

On appeal, the appellant argues that by finding that the victim suffered particularly great psychological and emotional injury, the trial court "made an assumption that the record did not bear out." The appellant further contends that the record contained no proof that consecutive sentencing was necessary to protect the public and the victim from future criminal conduct. Specifically, the appellant asserts that "there had been no accusation whatsoever that [the appellant] had ever made improper advances toward anyone other than his adoptive daughter." The appellant maintains that a minimum eight-year sentence at one hundred percent would have been "more than adequate" to protect the victim, because the victim would be twenty-three years old upon the appellant's release.

Tennessee Code Annotated section 40-35-115(b)(5) (1997) provides that a trial court may impose consecutive sentences if the trial court finds by a preponderance of the evidence that

> [t]he defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and

the extent of the residual, physical and mental damage to the victim
or victims[.]

In the instant case, the appellant was the victim's stepfather and subsequently adopted the victim. The incidents supporting the appellant's convictions for aggravated sexual battery and sexual battery spanned a two-year time period from May 1998 to May 2000. Regarding the nature and scope of the sexual contact, at trial the victim testified to being touched, fondled, and penetrated by the appellant. Contrary to the appellant's assertion that the record contained no evidence that the victim suffered great psychological and emotional injury, we note that the victim's mother testified at trial that as a result of the sexual abuse, the victim had attempted suicide, had "scratche[d] herself," and had been hospitalized at Valley Hospital. We conclude that these circumstances warrant the imposition of consecutive sentences under Tennessee Code Annotated section 40-35-115(b)(5).

### III. Conclusion

For the foregoing reasons, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE